UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Michael Robert Crimi,

                         Plaintiff,

      v.

Commissioner of Social Security,

                        Defendant.

**Decision and Order**

19-CV-455 HBS
(Consent)

---

## I.  INTRODUCTION

The parties have consented to this Court's jurisdiction under 28 U.S.C. § 636(c).  The Court has reviewed the Certified Administrative Record in this case (Dkt. No. 4, pages hereafter cited in brackets), and familiarity is presumed.  This case comes before the Court on cross-motions for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.  (Dkt. Nos. 9, 10.)  In short, plaintiff is challenging the final decision of the Commissioner of Social Security (the "Commissioner") that he was not entitled to Disability Insurance Benefits under Title II of the Social Security Act.  The Court has deemed the motions submitted on papers under Rule 78(b).

## II.  DISCUSSION

"The scope of review of a disability determination . . . involves two levels of inquiry.  We must first decide whether HHS applied the correct legal principles in making the determination.  We must then decide whether the determination is supported by substantial evidence." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987) (internal quotation marks and citations omitted).  When a district court reviews a denial of benefits, the Commissioner's findings as to any fact, if supported by substantial evidence, shall be conclusive.  42 U.S.C. § 405(g).

"The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations. And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is 'more than a mere scintilla.' It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, ___ U.S. ___, 139 S. Ct. 1148, 1154 (2019) (internal quotation and editorial marks and citations omitted); *see also Tejada v. Apfel*, 167 F.3d 770, 773-74 (2d Cir. 1999).

The substantial evidence standard applies to both findings on basic evidentiary facts, and to inferences and conclusions drawn from the facts. *Stupakevich v. Chater*, 907 F. Supp. 632, 637 (E.D.N.Y. 1995); *Smith v. Shalala*, 856 F. Supp. 118, 121 (E.D.N.Y. 1994). When reviewing a Commissioner's decision, the court must determine whether "the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached" by the Commissioner. *Winkelsas v. Apfel*, No. 99-CV-0098H, 2000 WL 575513, at *2 (W.D.N.Y. Feb. 14, 2000). In assessing the substantiality of evidence, the Court must consider evidence that detracts from the Commissioner's decision, as well as evidence that supports it. *Briggs v. Callahan*, 139 F.3d 606, 608 (8th Cir. 1998). The Court may not reverse the Commissioner merely because substantial evidence would have supported the opposite conclusion. *Id*. "The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks and citations omitted).

For purposes of Social Security disability insurance benefits, a person is disabled when unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B).

Plaintiff bears the initial burden of showing that the claimed impairments will prevent a return to any previous type of employment. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which the plaintiff could perform." *Id.*; *see also Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir. 1983); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

To determine whether any plaintiff is suffering from a disability, the Administrative Law Judge ("ALJ") must employ a five-step inquiry:

(1) whether the plaintiff is currently working;

(2) whether the plaintiff suffers from a severe impairment;

(3) whether the impairment is listed in Appendix 1 of the relevant regulations;

(4) whether the impairment prevents the plaintiff from continuing past relevant work; and

(5) whether the impairment prevents the plaintiff from doing any kind of work.

3

20 C.F.R. §§ 404.1520 & 416.920; *Berry, supra*, 675 F.2d at 467.  If a plaintiff is found to be either disabled or not disabled at any step in this sequential inquiry then the ALJ's review ends.  20 C.F.R. §§ 404.1520(a) & 416.920(a); *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  However, the ALJ has an affirmative duty to develop the record.  *Gold v. Secretary*, 463 F.2d 38, 43 (2d Cir. 1972).

To determine whether an admitted impairment prevents a plaintiff from performing past work, the ALJ is required to review the plaintiff's residual functional capacity ("RFC") and the physical and mental demands of the work done in the past.  20 C.F.R. §§ 404.1520(e) & 416.920(e).  The ALJ must then determine the individual's ability to return to past relevant work given the RFC.  *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994).

Of the various issues that the parties have raised, the issue that draws the Court's immediate attention concerns plaintiff's date last insured.  To receive Title II benefits, claimants must satisfy the applicable disability requirements while they have disability insurance status.  *See* 42 U.S.C. § 423(a)(1); 20 C.F.R. §§ 404.110, 404.320; *see also Arnone v. Bowen*, 882 F.2d 34, 38 (2d Cir. 1989) (citations omitted).  The parties do not dispute that plaintiff had disability insurance status between 2003 and 2008 and that his date last insured was December 31, 2008.  Through the date last insured, the ALJ found that plaintiff had the severe impairments of left knee surgeries, depression, bipolar disorder, and panic disorder.  [16.]  After finding that plaintiff met no medical listing through the date last insured, the ALJ concluded that plaintiff had the RFC for light work with some exertional and non-exertional limitations.  [19–20.]  Plaintiff now challenges the RFC and the Commissioner's final determination on the basis that the ALJ failed to give appropriate consideration to three different opinions: treatment opinions by physician assistant Alice Barber; an audiology evaluation from 2009 that, in plaintiff's view, would establish his tinnitus as a severe impairment; and

4

orthopedic opinions from Dr. Diane DenHaese. The problem for plaintiff is that the opinions on which he relies all came after the date last insured. Plaintiff's counsel acknowledged the problem at the hearing before the ALJ, when plaintiff appeared to focus mostly on neck and knee pain:

> ALJ: All right, let me ask you, your brief doesn't address the DLI in this case, which is in 2008.
>
> ATTY: Right.
>
> ALJ: Can you tell me what establishes a severe medically determinable right knee impairment as of December 2008?
>
> ATTY: Right, so the claimant did treat for his knees previously in Las Vegas, before he moved back to Buffalo. And, at that point he began treating with the VA for his continuing knee pain, as well as his mental health.
>
> ALJ: Okay. Well, what—can you tell me specific evidence that establishes that it was severe as of December 2008? Because, I did not see much evidence with regard to that time period.
>
> ATTY: Right, unfortunately, there was not much. I do see, let's see, Exhibit 3F, at 21. It looks like a diagnosis of osteoarthritis involving the knee. He was continuing to treat for that.
>
> ALJ: When was his treatment for that; the period around December 2008?
>
> ATTY: The treatment date for this was November 28, 2006.
>
> ALJ: Uh-huh. Anything else?
>
> ATTY: I also did note 7F, page 48, it did include evaluation of his right knee. Although, it was—this evaluation was in 2012, it did talk about the fact that his knee, you know, did have surgical screws, and certainly did talk about kind of the history of his right knee issues.
>
> ALJ: Okay. Does the record establish any other physical medically determinable impairments as of December 2008?
>
> ATTY: He was also treating for chronic neck pain, and degenerative arthritis.
>
> ALJ: When was that?
>
> ATTY: Okay. The neck pain was also 3F, at 21, so that would have been in 2006, that it's mentioned. And, the cervical spondylosis is entered in as a diagnosis as of October 19, 2006. This is page 7F, at 120.

> ALJ: Okay. But, I'm looking for something that established it as of the DLI, that shows that it continued at a severe level as of the DLI.
>
> ATTY: Okay. So, since the DLI?
>
> ALJ: Not since, as of the DLI.
>
> ATTY: At the DLI.
>
> ALJ: That he actually had a severe impairment at that time.
>
> ATTY: Right, so that was one of his diagnosis in 2006. He did continue to treat for it since—
>
> ALJ: Well, where's the continued treatment history? That's what I'm not seeing here.
>
> ATTY: One treatment note in 2006, is 3F, at 21. He did also treat for the neck pain.
>
> ALJ: But, we need treatment taking us to December 2008, to show it was severe then.
>
> ATTY: Right, that was in 2006, yeah. So, it is something that he has continued to treat for since that point, and has treated with the VA for all of these.
>
> ALJ: Okay. So, it's your position that that's sufficient to establish a severe medically determinable neck impairment as of December 2008?
>
> ATTY: Yes, your honor, I think that he has continued to have that problem. And, he has treated at the VA for that since that point.
>
> ALJ: All right, well let's be clear. What I'm most interested in is December 2008. So, whatever impairments he may have now, and whatever his limitations may be now, is of much less interest to me.
>
> ATTY: Right.

[40–43.] PA Barber mentioned plaintiff's neck and knee pain in clinical notes in 2005 but also noted that his symptoms improved with pain medication. [424.] The bulk of PA Barber's clinical notes postdate 2008, and PA Barber appears to have documented a worsening of plaintiff's conditions and not a contemporaneous assessment prior to the date last insured. *Cf. Gonzalez ex rel. Guzman v. Sec'y of U.S. Dep't of Health & Human Servs.*, 360 F. App'x 240, 243 (2d Cir. 2010) (summary order)

(Commissioner affirmed where "at no point is there any documented medical determination that meets all of the required criteria of any given impairment under the Listing of Impairments" during the insured period); *accord Clark v. Saul*, No. 19 CIV. 264 (GWG), 2020 WL 1224641, at *8 (S.D.N.Y. Mar. 13, 2020) ("To show her condition, Clark relies heavily on medical records that post-date the relevant time period. But for these records to provide substantial evidence of a disability during the relevant time period, the records must actually shed light on Clark's condition during that period.") (citations omitted). A clinical note from 2010 supports this view; while the note documents plaintiff's claim to have sustained knee injuries while on active duty in the 1970s, the note also makes note of a "gradual onset" of orthopedic problems. [641.] An examination in 2017 noted constant pain but no acute distress; full strength; and only mild crepitus. [662.] Similarly, plaintiff mentioned symptoms of tinnitus as early as 2005, but little clinical information at that time offered any details. [427.] Plaintiff was not formally diagnosed with hearing loss until 2009 and tinnitus until 2010. [627, 1072.] *Cf. Lau v. Comm'r*, 339 F. Supp. 3d 421, 429 (S.D.N.Y. 2018) ("Accordingly, because of the lack of retrospective diagnoses and any other record evidence of schizophrenia or hoarding disorder during the Relevant Period, the ALJ could properly find that Lau did not suffer from such medically determinable impairments during that period.") (citations omitted). Finally, Dr. DenHaese examined plaintiff in 2012 and noted that he started developing hip pain only two years earlier. [976.] Plaintiff at that time denied "any prior injury." [976.] Dr. DenHaese noted further that plaintiff had no knee surgeries since 1995. [994.] Dr. DenHaese noted extensive meniscal degeneration, but the clinical note, having been written in 2012, contains no information suggesting that the doctor was attempting to reach back and to describe plaintiff's condition as it stood prior to the date last insured. [996.] *Cf. Flanigan v. Colvin*, 21 F. Supp. 3d 285, 302 (S.D.N.Y. 2014) ("Contrary to establishing the existence of a severe impairment before December 31, 2008, at best

7

the evidence shows that Flanigan experienced progressively worsening symptoms that eventually became disabling sometime in 2009 at the earliest."). These clinical notes, plus others that the Commissioner has cited, make two related points: Plaintiff's orthopedic symptoms certainly worsened, but after the date last insured; and no treatment provider appears to have attempted any clinical note after 2008 that would have described plaintiff's situation as of 2008.

Under these circumstances, the ALJ had discretion to interpret the clinical record as a documentation of worsening symptoms after the date last insured. To the extent that plaintiff disagrees about the level of detail in the clinical notes as of 2008, resolving factual disagreements is where the substantial-evidence rule has maximum effect. "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (internal quotation marks and citation omitted); *see also Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) ("We examine evidence both supporting and detracting from the decision, and we cannot reverse the decision merely because there exists substantial evidence supporting a different outcome.") (citation omitted); *Henderson v. Comm'r*, No. 18-CV-00072, 2019 WL 3237343, at *5 (W.D.N.Y. July 18, 2019) (affirming ALJ resolution of RFC where treating physician records supported exertional limits despite other evidence in the record). Under these circumstances, the Court is obligated to affirm the Commissioner's final determination regardless of how it might have viewed the evidence in the first instance.